UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KEVIN PACK, )<br>)<br>Plaintiff, )<br>)<br>vs. )   CAUSE NO. 3:19-CV-501-PPS-MGG<br>)<br>TRENT MAST, )<br>)<br>Defendant. ) | |

# OPINION AND ORDER

This is the second round of summary judgment in this case. About nine months ago, I denied Defendant Trent Mast's motion for summary judgment based upon the statute of limitations. Now, Mast has filed a motion for summary judgment arguing that the facts uncovered during discovery show that he is entitled to judgment as a matter of law on Plaintiff Kevin Pack's two claims for interference with business contracts and intentional infliction of emotional distress. Pack claims that Mast sent defamatory e-mails to his former employer that contributed to his termination. Because the undisputed material facts show Mast is entitled to judgment as a matter of law, Mast's motion will be granted.

**Undisputed Material Facts**

The following are the undisputed material facts as set forth by the parties. Mast owned a residential duplex in Middlebury, Indiana. Sometime in 2013, Gerald Rasler, the principal of Northridge High School (which was part of Middlebury Schools), contacted Mast about a vacancy in his duplex for a new teacher at the high school.

[Mast Dep., DE 36-2 at 6.]  That new teacher was Pack, and Mr. Rasler put him in touch with Mast about the vacancy.  [*Id.* at 7.]  Near the beginning of August 2013, Mast and Pack entered into a written lease agreement for an apartment in the duplex.  [*Id.* at 14.]  Mast actually lived in the same duplex building, so they were neighbors and had semi-regular contact with each other.  [*Id.* at 33.]  On August 6, 2013, Pack became employed by the Middlebury Schools as a German language teacher at Northridge High School.  [DE 36-1 at 1.]

A week after Pack leased the apartment, he made arrangements for another teacher to co-lease the apartment with him.  [DE 36-2 at 8-9.]  The new tenant was Mr. Zhongjie, a Chinese language teacher at the Middlebury Schools middle school.  [*Id.* at 13.]  The lease was renegotiated to include Mr. Zhongjie's name and lease obligations.  [*Id.* at 9-11.]

Over the next several months, Mr. Zhongjie complained to Mast about his roommate.  According to Mr. Zhongjie, Pack had a terrifying dog, he bossed him around, and he was an overall disagreeable person.  [*Id.* at 15-16, 18.]  Another issue emerged, which was that Pack sometimes failed to make timely rent payments.  [*Id.* at 16, 18.]  Then, the two got into a dispute about the Internet service in the building.  Mast refused Pack's requests to install a new Internet service, but Pack went ahead anyway and installed the new Internet service because he wanted faster Wi-Fi.  [*Id.* at 20; Pack Dep., DE 36-3 at 48.]

As the relationship between Pack and Mast got more and more strained, Mast

2

started e-mailing the school. Over the course of three months, Pack sent 4 e-mails. Two were directed to Principal Rasler, one to Rasler and Jane Allen (who was the school superintendent), and one e-mail just to Allen. These e-mails constitute the basis of Pack's lawsuit, so they need to be considered at length.

Mast sent his first e-mail to Principal Rasler on November 25, 2013. [DE 37-3 at 3.] In this e-mail, Mast states in pertinent part that he "question[s] [Pack's] integrity," and "I know I would not want him teaching my kids." [*Id.*] Mast explains that his wife does not feel comfortable or safe at home without him because Pack "is just such a wildcard and unpredictable." [*Id.*] He also states that he has no proof that Pack smokes marijuana, but one day a friend told him there was a cloud of marijuana smoke coming from the house. [*Id.*] Mast ends the e-mail by stating, "[t]his may be one of those emails that you read and discard and that's fine" but he felt things had gotten to a point that he needed to say something. [*Id.*] Mast received an automatic response, saying that Principal Rasler was out of the office until Monday, December 2, and would resume communications at that time. [DE 37-3 at 4.]

The second e-mail from Mast to Principal Rasler is dated December 4, 2013. [DE 37-3 at 5.] Mast stated he was contacting Mr. Rasler again because he believed the matter was "important." [*Id.*] He said the situation had gotten worse, he was on the verge of losing Mr. Zhongjie as a tenant because Pack is "basically adult bullying him" and he is thinking about talking to a lawyer about eviction options. [*Id.*]

The next e-mail from Pack was to Mr. Rasler and Ms. Allen, dated December 20,

3

2013.  [DE 37-3 at 1.]  The e-mail states in its entirety:

> Hello, I would like to take a minute and update you both on the situation with Kevin Pack.  I was about 5 hours away from concretely evicting him last week because of unwillingness to pay rent on time along with the late charges.  He paid in full when he knew he had to the night before I was going to the court house.  As of this point in time I am not filing for an eviction based upon my wife feeling unsafe, or Kevin bullying Zhongjie into leaving (which he is), or overall properly treatment and annoyance/nuisance as a renter.  I quite honestly have too much uncertainly, after talking to a lawyer, on what a judge would decide.  Frankly, had I ever had concrete ability to evict him I never would have contacted either of you in the first place, other than to voice my concern for the kind of person we have teaching in our school system.  Which I still hold firmly is a bit shameful considering the things I've heard from students' mouths and through parents of kids in Kevin's german classes.  Among other things I've heard, I would think him stating that he acknowledges his students are mutinying against him in class and him not caring is a pretty good sign that there will be no productivity going on the rest of the year for these students.  I know I would be frustrated as a student and even more frustrated as a parent knowing that my student wasn't getting anything out of class because the teacher is threatening, immature and unable to communicate properly with students.  If a change in scenery is not in store I'd hate to see what it takes to be let go in our school system.  There's my two cents and an update.

[DE 37-3 at 1.]   In response, Principal Rasler thanked Mast for the communication and said the information "[was] appreciated." [*Id.* at 2.]

The last e-mail to Ms. Allen, the school superintendent, was written from Mast on February 23, 2014. [DE 37-3 at 8.]  This is a meandering e-mail that I won't recite in full.  But some highlights include: Mast is outraged that Pack still has a job in the school system; a fellow teacher saw Pack's class standing outside and the students said he had locked them out because he thought they would steal things; Pack "chugged" a two

4

liter of pop during class; and in Mast's opinion the school "would be better off with a substitute reading from a German manual the rest of the year than having a feuding/immature teacher fight with his students." [*Id.*]  Also, Mast stated he was told "that a sanitized breast pumping station was set up in one of the men's teacher bathrooms in a hall with all women teachers only to have Mr. Pack go in and urinate on the floors and walls and tell an administrator of some sort that he did it to spite the fact that they were trying to use a men's room for such purposes." [*Id.*]  Mast insists "there is no reason he should still be employed." [*Id.*]  In response, Ms. Allen e-mailed Mast back, thanked him for his concern, and said she appreciated him providing the information. [*Id.* at 7.]

Ultimately, Pack was fired from his teaching job.  On April 2, 2014, the Middlebury Community Schools Board of School Trustees issued a document citing 76 findings of fact in support of why Pack was being terminated for immorality, insubordination, and a neglect of duty.  [DE 36-1.]  I won't recount the entire l0-page document, but some of these facts state that Pack: received mostly "developing" ratings, he did not follow the directive to collaborate with the other German teacher, his curriculum lacked consistency, there were numerous referrals by students/parents concerning his tone and content when speaking with students, not enough German was spoken by Pack, the students were not conversing enough in German, Pack showed an R-rated movie to a class made up primarily of freshman and sophomores which contained obscenities and a sadomasochistic scene, his classroom was sloppy and

5

disorganized, he showed his Level 4 German class a movie featuring people consuming alcohol that made several students uncomfortable, he told an inappropriate Jewish joke during a lesson covering the Holocaust, several students complained that he lost work, several students complained that when Pack gave the semester final exam he allowed the students to grade their own exams, parents expressed concern to Mr. Rasler and Ms. Allen and they wanted their children to continue taking German class with another teacher, Pack left an inappropriate book featuring nude drawings, foul language, and sexual content in class titled something like "All the German You Were Never Taught in School," he regularly kept students locked out of his classroom right up until school began and often between classes, he arrived late on several occasions, several employees stated they did not feel safe working in the same building as Pack, he missed several faculty meetings, and he often returned from lunch late through a secure door which he was not supposed to open. [DE 36-1.]

Pack attaches to his response a decision by an administrative law judge from August 8, 2014, where the ALJ found that he was discharged without just cause because he weighed Pack's sworn testimony against the hearsay testimony of the employer, so the ALJ concluded that the claimant "did not do the acts in question" in the School Board's finding of fact. [DE 37-2 at 3.]

After Pack was fired, he initiated a separate lawsuit, *Kevin Pack v. Middlebury Community Schools*, No. 3:15-cv-00028-PPS-MGG (N.D. Ind. 2015). In that case, Pack brought claims under section 1983 and Title VII for wrongful termination, claiming he

6

was improperly fired after the school learned he was an atheist and after he objected to certain practices of the school principal that allegedly promoted religious beliefs in a public school.[1] Discovery was conducted during that litigation, and this is how Pack became aware of the e-mails Mast sent to the principal and superintendent approximately three and a half years earlier. The complaint in this case alleges that "[t]he known examples of Mast's communications are contained in e-mail traffic to Principal Rasler, produced in discovery in termination-related litigation on June 24, 2017." [Compl., DE 1, at ¶ 7.]

This case was filed on June 27, 2019. The complaint alleges two state law claims: Count I for interference with business contracts and Count II for intentional infliction of emotional distress. [DE 1.] (Subject matter jurisdiction is based on diversity of citizenship. Pack is a citizen of Nebraska having moved there after being fired by the Middlebury Community School Corporation. Mast is a citizen of Indiana and the amount in controversy exceeds $75,000.) The depositions of Mast and Pack were both taken in this case. The beginning of Pack's deposition was contentious. Pack refused to answer some questions, claiming he did not want to disclose certain information, and that certain questions were an invasion of privacy, an invasion of his medical privacy, and an invasion of HIPAA. [DE 37-5 at 12-19.]

---

[1] This lawsuit presumably ended in a settlement, as the parties stipulated to the voluntary dismissal of it, with prejudice, in November 2016. [Case No. 3:15-cv-28, DE 62.]

**Discussion**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## I. Interference with Pack's Business Contract (Count I)

In order to recover for tortious interference with a contractual relationship under Indiana law, a plaintiff must show: "(1) existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of a breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." *American Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 214 (Ind. 2019) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994)).

Pack's sole argument as to this claim is that:

> Pack need not assert or prove that Mr. Mast induced the breach of the employment agreement. He has stated the burden correctly. He has asserted that Mr. Mast made false, malicious and untrue statements to the Plaintiff's supervisor, Principal Rasler, and to the School Superintendent with the <u>intent</u> to cause or encourage them to terminate Pack's employment. Causation, in fact, is not a required component of Pack's complaint and he need not prove and has never claimed that Mast's actions were the cause of the termination.

[DE 37 at 5 (emphasis in original).] Pack is correct on the facts but wrong on the law.

8

As the court made clear in *Neterer v. Slabaugh*, 548 N.E.2d 282, 834 (Ind. Ct. App. 1990), inducement is "analogous to causation" in an action for tortious interference with a contract. In that case, the court found that the impending breach had nothing to do with the acts of the defendants. *Id.* Because the defendants did not cause the breach, and "[t]he causation was external," the plaintiff failed to make a prima facie showing for a claim of tortious interference with a contract. *Id.* So in this case, when Pack concedes that Mast's emails did not cause his termination, he has effectively admitted that summary judgment is warranted on the claim for tortious interference with a contractual relationship.

The undisputed facts show that Mast did not induce or cause Middlebury Schools' breach of Pack's employment contract. When asked during his deposition what evidence he had that the e-mails caused him to be terminated, Pack answered, "[a]t this point in time, I cannot remember, I don't know either way right now." [DE 36-3 at 55.] The school board terminated Pack's contract after making 76 specific findings of fact, and concluding that his actions constituted immorality, insubordination, and a neglect of duty. [DE 36-1.] None of the facts referenced in that lengthy document include, or even reference, the subject matter of the e-mails Mast sent to Mr. Rasler and Ms. Allen. Finally, in accordance with I.C. § 20-28-7.5-2, the Middlebury Community Schools Board of School Trustees is the entity that actually made the decision and terminated Pack's employment. [DE 36-1.] There is no evidence that Mast ever contacted any member of the school board. [DE 36-2 at 51-52.]

9

All of these causation issues show that Mast did not induce or cause the contract between Middlebury Schools and Pack to be terminated. As such, summary judgment is warranted on the claim for tortious interference with a business contract.

## II.     Intentional Infliction of Emotional Distress (Count II)

To prevail on a claim for intentional infliction of emotional distress, a plaintiff has to demonstrate that the defendant: (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another. *Parish v. City of Elkhart,* 614 F.3d 677, 683 (7th Cir. 2010) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)). "Intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind." *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009) (quotation omitted). "In the appropriate case, the question can be decided as a matter of law." *Id.*

Mast argues the e-mails are not outrageous enough in character to constitute intentional infliction of emotional distress, the approximately 3 and a half year time gap between when the e-mails were sent and when Pack became aware of them shows they could not have caused him severe emotional distress, Mast did not intend to cause emotional harm, and there is no real evidence that Pack actually suffered emotional harm. Frankly, all of these are very strong arguments. Instead of addressing them head on, in response, Pack asserts that Defendant's argument about causation is a "non sequitur" because Pack's claim is for defamation per se. [DE 37 at 9.] In actions for

defamation per se, damages are presumed. *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010). Let me address Pack's response first, and then I'll return to the rubric for the claim of intentional infliction of emotional distress.

The issue that arises with Pack now arguing defamation per se in response to the summary judgment motion is whether it is proper for him to change his theory of recovery at this late stage. There is no direct mention of defamation in "Count II - Intentional Infliction of Emotional Distress" of the complaint which states that "[t]he acts and communications from Defendant to his employer and various other acts were intentionally done to cause Pack emotional distress as retaliation and payback to punish Pack for his refusal to forfeit his lease and for Pack's successful resistance in the related court proceedings." [DE 1 at 2.] However, in support of the interference with business contract claim, Pack does allege that Mast made "false and defamatory accusations to Plaintiff's employer . . . " and this allegation was reincorporated in the intentional infliction of emotional distress count. [DE 1 at 1-2.]

"When a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). If it changes the factual theory, the plaintiff could effectively be trying to amend the complaint. *Id.* But if it just changes the legal theories being pursued, the "court should consider the consequences of allowing the plaintiff's new theory." *Id.* For example, if it could cause unreasonable delay or make it more

11

difficult or costly to defend, "the district court can and should hold the plaintiff to his original theory." *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996). This is a close call as to whether Pack is changing the legal theory or the factual theory at this point. On the one hand, he did allege in the complaint that Mast made false statements in the e-mails, but on the other hand, Pack so clearly labeled his claim as one for "**Intentional Infliction of Emotional Distress**" and alleged that the e-mails were intentionally sent to cause him emotional distress and to punish him. [DE 1 at 2 (emphasis in the original).] There is a substantial factual difference between being defamed, on the one hand, and being intentionally subjected to emotional distress, on the other. Pack "cannot, at the last minute, and in response to summary judgment, offer an entirely new theory." *Cook Biotech Inc. v. Acell, Inc.*, No. 4:03-CV-0046, 2005 WL 3828729, at *5 (N.D. Ind. June 22, 2005) (citing *Hays v. General Elec. Co.*, 151 F.Supp.2d 1001, 1006 (N.D. Ill. 2001) ("[T]he plaintiff must commit to a theory of the case at some point . . . A change of theories at the summary judgment stage is not allowed because, ordinarily, discovery has been completed, and an eleventh hour change of theory would waste judicial resources and the resources of the parties.").

Whether Pack's mid-stream switcheroo here is "factual" or "legal" really doesn't matter, because even if I give Pack the benefit of the doubt and characterize the claim as one for defamation, the claim is a loser anyway. He has not submitted sufficient evidence in support of a defamation per se claim, which requires proof of four elements: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4)

damages. *Newman v. Jewish Cmty. Ctr. Ass'n of Indianapolis*, 875 N.E.2d 729, 735 (Ind. Ct. App. 2007). The defendant is entitled to summary judgment if the undisputed material facts negate at least one of the required elements. *Shine v. Loomis*, 836 N.E.2d 952, 956 (Ind. Ct. App. 2005).

In order to maintain an action for defamation per se, "a plaintiff must first assert that the statement is false." *In re Indiana Newspapers Inc.*, 963 N.E.2d 534, 549 (Ind Ct. App. 2012.) Defamation per se arises when the language of a statement, without reference to extrinsic evidence, "constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct." *Dugan*, 929 N.E.2d at 186. The only category that Mast's statements could fit into is the misconduct in Pack's profession or occupation. "Statements are only defamatory *per se* when they constitute a serious charge of incapacity or misconduct in words so obviously and naturally harmful that proof of their injurious character can be dispensed with." *Moore v. Univ. Notre Dame*, 968 F. Supp. 1330, 1334 (N.D. Ind. 1997) (quotation omitted).

After showing a communication with defamatory implication, the next requirement of a defamation claim is "malice" which generally just means the absence of legal justification. *LDT Keller Farms, LLC v. Brigitte Holmes Livestock*, No. 1:08-cv-243, 2010 WL 260842, at *3 (N.D. Ind. June 25, 2010). The parameters for proving malice depend upon the status of the plaintiff and the nature of the controversy. Here, Pack is

13

a private figure (as opposed to a public one).[2]

The parties have not directly addressed the next consideration, which is whether the material is of a general or public interest, or only a private interest.  "A matter of general or public interest is one in which the public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct." *Filippo v. Lee Publ'ns, Inc.*, 485 F.Supp.2d 969, 973-74 (N.D. Ind. 2007) (internal quotes omitted).  By contrast, courts have found speech that only involves "the individual interest of the speaker and its specific business audience" to not be an issue of public or general concern.  *LDT Keller Farms*, 2010 WL 2608342, at *4 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985)).

Here, I think this is an issue of public or general concern since Pack was a public high school teacher and the statements Mast made about him could go towards his fitness to interact with children and be a teacher.  *See, e.g., Poyser v. Peerless*, 775 N.E.2d 1101, 1106 (Ind. Ct. App. 2002) (finding matter of public or general concern in defamation action where school made statements in a letter to the school's community about a teacher's departure).  When the issue involves a matter of general concern, a higher level of malice must be shown.

Pack may recover for injury caused by defamation only if he can prove "actual

---

[2] Whether Pack is a private or public figure is not actually determinative, though, because "in Indiana, in a matter of public or general concern, both private figures *and* public figures must show that the defamatory statement was made with actual malice." *LDT Keller Farms*, 2010 WL 2608342, at *4 (emphasis in original) (citing *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 452 (Ind. 1999)).

14

malice," or that the publication was made with knowledge that it was false or with reckless disregard of whether it was false. *Moore*, 968 F.Supp. at 1336; *Bandido's, Inc.*, 712 N.E.2d at 452-54.  Pack cites two old cases, *Rose v. Indianapolis Newspapers*, 213 F.2d 227 (7th Cir. 1954), and *Patton v. Jacobs*, 78 N.E.2d 789 (1948), for the proposition that for defamation per se, malice is implied. [DE 37 at 3.]  Those cases simply don't say that, and in reality, Indiana has adopted an "actual malice" standard for defamation involving private plaintiffs in matters of public concern.  *In re Ind. Newspapers Inc.*, 963 N.E.2d 534, 550 (Ind. Ct. App. 2012).  Pack seems to concede this fact when, later in his memorandum, he quotes *Baker v. Tremco Inc.*, 917 N.E.2d 650, 657 (Ind. 2009), which specifically states that "[t]o maintain an action for defamation *per se* the Plaintiff must demonstrate . . . (2) malice . . . ."

In order to prove that a defendant published with malice or reckless disregard, there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."  *Moore*, 968 F.Supp. at 1336 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  Reckless disregard is more than mere negligence, and it must be shown that the statements were made "with a high degree of awareness of [its] probable falsity."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 331 (1974) (quotation omitted).  Actual malice must be shown by clear and convincing evidence.  *Bandido's*, 712 N.E.2d at 456.

Here, Pack has presented no evidence whatsoever that Mast had serious doubts

15

as to the truth of his e-mails.³ To the contrary, Mast's deposition testimony shows that he believed the content in the e-mails was true. Mast's brother was a teacher in the school district and told him some things about Pack. [DE 37-4 at 26, 46.] Additionally, one of Pack's students was the daughter of a family friend, and that student told Mast stories about Pack's actions in class. [*Id.* at 30, 42, 49.] Mast owned a restaurant (that he ended up selling to that student's parents), and Mast said he heard things in a booth in the diner, or people approached him and told him things about Pack because they knew Pack was his tenant. [*Id.* at 29, 44-45.] Mast testified that someone told him about the breast pumping station incident, but he didn't recall who. [*Id.* at 45.] Mast testified he was frustrated and venting in his e-mails. [*Id.* at 34.] He said it was a "possible interpretation" if someone took the e-mails to mean he thought Pack should be fired. [*Id.* at 35.] However, Pack has not made any argument or put forth any evidence that Mast had malice — or that he knew the statements were false or made with reckless disregard of whether they were false or not.

Pack also has not set forth evidence that the statements were actually false. In his memorandum, he does cite to Mast's statement in his deposition that he had an original objection to the lease "but we restructured" it [DE 37-4 at 9], but otherwise, Pack has not

---

³ While I'm on this topic, Pack has not adhered with Federal Rule of Civil Procedure Rule 56 or our Local Rule 56-1. In his designation of evidence and material issues of fact, Pack lists as his "evidence supporting factual disputes": 1. Unemployment Decision; (2) Emails from Defendant Mast to Middlebury Principal Rasler and Superintendent Allen; (3) Deposition of Trent Mast; and (4) Deposition of Kevin Pack, and attached the same in entirety. [DE 37-1 at 2.] This is not sufficient to just generally refer to all of the full depositions and documents, without citing to specific facts in each.

cited to any evidence in the record showing that the statements in the e-mails were false. I also question whether the content of the emails was "so obviously and naturally harmful that proof of their injurious character can be dispensed with." *Levee v. Beeching*, 729 N.E.2d 215, 220 (Ind. Ct. App. 2000) (quotation omitted). For all of these reasons, even construing the record in the light most favorable to Pack, there is no evidence from which a jury could find the elements of a claim for defamation.

Since the complaint also alleges the intentional infliction of emotional distress and Pack briefly mentions it in is memorandum [DE 37 at 9], it is necessary to address this count (even though it is unclear whether Pack is still pursuing it). In cases of intentional infliction of emotional distress, the "[c]onduct is extreme and outrageous only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Carroll v. County of Porter*, No. 2:12-CV-412, 2013 WL 3676783, at *3 (N.D. Ind. July 11, 2013) (quoting *Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996)). The Indiana Supreme Court has quoted with approval the Comment to section 46 of the Restatement (SECOND) OF TORTS in describing the extreme and outrageous conduct required for this tort. *See, e.g., Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. 2002). The Restatement provides the following guidance:

> Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that

17

> he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (SECOND) OF TORTS § 46 cmt. d (1965).  The requirements to prove this tort are rigorous, and at its foundation is "the intent to harm the plaintiff emotionally." *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011) (quotation omitted).

In considering the four e-mails drafted by Mast, I cannot say their content is so extreme and outrageous to properly support a claim for intentional infliction of emotional distress.  Mast's general opinion that Pack is an unfit teacher definitely does not fit into this category, nor do the statements that Pack engaged in adult bullying, he is unpredictable, lacks integrity, didn't have control of his students, is immature, and that a friend told Mast he saw marijuana smoke outside of the duplex on one occasion. While the comments about Mast urinating on the floors and walls of the area allocated to female teachers for breast pumping come the closest, I still don't consider those extreme enough or outrageous.  I conclude as a matter of law that Mast did not engage in such extreme and outrageous conduct to support a claim of intentional infliction of emotional distress.  *See McCollough v. Noblesville Schools*, 63 N.E.3d 334, 342 (Ind. Ct. App. 2016) (granting summary judgment where Defendant's conduct, even if intentional, did not qualify as being so outrageous in character or extreme in degree to

be regarded as utterly intolerable by a civilized community).

Moreover, I cannot say the e-mails, which Mast conceded he only read more than three years after they were written and many years after he was terminated from his teaching job [DE 37-5 at 53-54], caused Mast extreme emotional distress. *See Medley*, 570 N.E.2d at 31 (affirming trial court's entry of summary judgment). Other than a general statement that finding out about the e-mails upset him, Mast has provided no evidence about how he has suffered emotional distress, the degree of it, or any other details in support of this claim. [DE 37-5 at 53-55.] For these reasons, to the extent Pack is still pursuing a claim for intentional infliction of emotional distress, summary judgment is warranted on this claim as well.

## Conclusion

For the aforementioned reasons, Defendant's motion for summary judgment [DE 35] is GRANTED. The Clerk is ORDERED to enter judgment in favor of Defendant, Trent Mast, and against Plaintiff, Kevin Pack. Finally, the Clerk is ORDERED to CLOSE this case.

SO ORDERED.

ENTERED: February 5, 2021.

 s/   Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT
